Estate of Joseph G. Giuliani, Deceased, Alfida E. Giuliani, Surviving Spouse v. Commissioner. Alfida E. Giuliani, Transferee v. Commissioner. Carol J. Giuliani, Transferee v. Commissioner.
Estate of Joseph G. Giuliani, Deceased v. Commissioner
Docket Nos. 29790, 34726, 34839.
United States Tax Court
1952 Tax Ct. Memo LEXIS 157; 11 T.C.M. (CCH) 673; T.C.M. (RIA) 52207; June 26, 1952
John E. Dwyer, Esq., Washington Bldg., Washington, D.C., and Donald M. Sullivan, Esq., for the petitioners. Paul E. Waring, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: These proceedings, consolidated for hearing, involve a deficiency of $19,477.53 in estate tax and transferee liability therefor. The petitioners in Docket Nos. 34726 and 34839 admit liability as transferees for any deficiency in estate tax, plus statutory interest, determined herein against the estate of the decedent. The issues are whether respondent erred in including in the gross estate the amount of $64,030 for certain property transferred in contemplation of death, the additional amount of $33,000 for jointly *158 held real estate, and $4,009.67 for the balance in a bank account, and denying as a deduction from the gross estate the amount of $15,203.65 for alleged indebtedness of the estate. The estate tax return of the decedent was filed with the collector of internal revenue for the district of Maryland. Findings of Fact The petitioner in Docket No. 29790 is the surviving spouse of Joseph G. Giuliani, who died May 24, 1946. She will hereinafter be referred to as "petitioner". The decedent and petitioner were married on July 14. 1904, when the former was 21 and the latter 17 years of age. At that time the decedent was operating a store at 247 New Jersey Avenue, N.W., Washington, D.C., for his uncle, Andrea Lazzari, who was then residing in Italy where the decedent and his wife were born. Such money as the decedent had was spent for his wedding. He received from Lazzari for his services at the store $30 per month and room and board. The day after her marriage petitioner started to work with her husband in the store. In January, 1905, Lazzari accepted a proposal of the decedent and his wife to operate the store on a partnership basis, Lazzari to receive one-half of the profits and the other *159 parties the remainder. Promptly thereafter, petitioner used all of her savings of $250 prior to her marriage to buy merchandise for and improve the store. The partnership arrangement continued until 1907 when the merchandise in the store was sold for $200 and the proceeds of sale were paid to Lazzari. The services performed by the petitioner in the store consisted of waiting upon customers, buying merchandise, paying bills, and other duties necessary in the conduct of the business. By the time the business on New Jersey Avenue was sold decedent and his wife accumulated about $3,000, part of which was used to purchase, in December, 1906, as joint tenants, a parcel of improved real estate located at 128 C Street, N.W., in connection with which they gave a deed of trust for $1,300. Thereafter, until the latter part of 1913, petitioner and decedent lived and operated a store at that place on an equal partnership basis. Decedent and his wife had four children, born as follows: Carol, April 25, 1905; Iolanda, August 30, 1906; Alva, October 27, 1907, and James, May 27, 1910. Carol did not attend school after the eighth grade. James was graduated in 1932 from Georgetown University where *160 he studied foreign service and accounting. Petitioner continued to work in the C Street store and performed duties similar to the work she did at the New Jersey Avenue place of business. She opened the store about 7 o'clock in the morning and remained there until about 2 o'clock in the afternoon and returned again in the evening after the children were put to bed. Decedent did the marketing, kept the books, and performed other duties in connection with the business. Petitioner had servants living at the home to attend to the children as they were born. She could speak and understand but could not write English. During 1912 decedent and his wife spent all of their savings of cash on a trip to Italy. By the close of that year the mortgage on C Street property had been paid in full. In 1913 the decedent and petitioner obtained a loan on the security of the C Street property and used the proceeds thereof to make a down payment on the purchase price of a parcel of residential property located at 1733 Columbia Road, N.W., title to which was taken in their names. The C Street business was sold in that year and in December 1913 the Giuliani family moved to, and a new store was opened *161 for business at, the Columbia Road property. The ground floor was used for a grocery store and delicatessen and the second floor was used by the Giuliani family for living quarters. In 1934 a liquor license was issued to decedent for use at the store. The business was at all times important conducted by decedent and petitioner under the same partnership arrangement followed in the operation of the C Street store. In June 1926 decedent and his wife purchased as tenants by the entirety, for $13,000, a parcel of residential property located at 2706 Ontario Road, N.W. Thereafter, until December 1946, when the property was sold by the surviving tenant, the property was rented. In November 1932, on the initiative of petitioner, the decedent and petitioner purchased at an auction sale, as tenants, by the entirety, a parcel of residential property located at 3610 Quesada Street, N.W. The down payment of $500 was paid by check issued by the decedent. They rented the property until June 1934 when they commenced to occupy it as a family residence and continued to reside there until after the death of the decedent. The sale was made to petitioner on her bid of $10,725. In July 1933 the decedent *162 and his wife, at her insistence, purchased as tenants by the entirety, for $17,500, the premises located at 1729 Columbia Road, N.W. The down payment of $500 was made by a check of the decedent. Carol was employed in the store continuously from 1919 until it was sold in 1946. He never had any other occupation. His principal duties were waiting upon customers and purchasing produce and fruit. James started to work in the store as soon as he was old enough to perform services. He devoted all of his time to the store from the time he was graduated from Georgetown in 1932 until November 1943, when he entered the Navy. He had no regular employment in the store after that time. He kept the books for the business, waited upon customers, made the purchases of liquor and performed such other duties as were required of him in the conduct of the business. Until the family residence was moved to Quesada Street in 1934, petitioner generally opened the store in the morning and remained there until the early part of the afternoon. She waited upon customers, made purchases and performed other duties incidental to the operation of the business. The decedent never enjoyed store work and as a consequence, *163 petitioner was required to take the initiative in business matters and otherwise run the store. He generally went to the store each day a short time before noon and remained there until late in the evening. He kept the books for the store until James took over the work, waited upon customers, did marketing and other work in the conduct of the business. From about the time in 1934 when the family took up their residence on Quesada Street until James entered the Navy in November 1943, Carol and James were resonsible to their parents for the operation of the business. At that time, decedent practically retired from the business and seldom went to the store. Petitioner discontinued her active participation in the business at that time. She visited the store on an average of about three times a week to ascertain whether the business was being managed to her satisfaction. Carol operated the business for his parents after James entered the Navy. He received some assistance from Iolanda, the wife of James and a brother of the decedent. Carol and James received a salary for the services they performed in the store. Decedent and his wife had an understanding that they would operate their *164 stores on an equal partnership basis. Petitioner was never paid a salary and withdrew from the business only such amounts as she required for the family budget. They always filed joint income tax returns. In 1933, at the request of his parents, James opened up a set of books for them for their four parcels of jointly held real estate, in which he showed that the real estate property and stock and good will of the business being conducted at 1733 Columbia Road belonged to the decedent and his wife and had a value of $36,186.88. The decedent and his wife had no income other than what they derived from the store business and rented real estate. Except for amounts borrowed, amounts paid on the real estate were derived by the decedent and his wife from the business and the real property. The decedent opened a checking account in his name at the northwest branch of the Riggs National Bank in August 1925. No other person was authorized to withdraw funds from the account. Sales receipts of the store were deposited in the account until July 6, 1937, and until July 20, 1933, rental payments received from real property held jointly with his wife. The account was closed on October 9, 1942, when *165 the balance of $33.60 in the account was used to open a joint account with his wife at the Chevy Chase branch of the same bank. On July 20, 1933, an account designated as "J. G. or James J. Giuliani Special" was opened in the northwest branch of the Riggs National Bank. It was an account kept for real estate. Only decedent and James had authority to withdraw money from the account. None of the money in the account belonged to James. Every month $100 was withdrawn from the store account and deposited in this account to pay principal and interest on jointly held real property of the decedent and his wife. The account kept for the real estate discloses deposits of $2,718 on January 14, 1936, and $1,400 on January 18, 1937, from unestablished sources and a charge of $2,590.10 on January 16, 1936, and $1,518.36 on January 23, 1938, of which $2,400 and about $1,500, respectively, was used to reduce the mortgage indebtedness on the 1733 Columbia Road property. The account was closed on July 2, 1937, when the balance of $373.31 was transferred to the personal account of decedent in the same bank. On July 6, 1937, a checking account was opened in the northwest branch of the Riggs National *166 Bank in the name of James and Carol with a deposit of $1,751.36. Only James and Carol had authority to withdraw money from the account. Receipts of the 1733 Columbia Road store were deposited in the account. On January 18, 1938, the amount of $1,500 was withdrawn from the account and deposited in the account kept in decedent's name. The amount was used by the decedent to make a payment on the mortgage indebtedness of the 1733 Columbia Road property. Due to the fact that James left the store, the account was closed November 29, 1943, when the balance of $3,104.98 in the account was transferred to a new joint account for the store in the same bank in the names of Carol and the decedent. Only Carol and the decedent had authority to withdraw money from the account. The balance in the account at the close of 1945 was $6,371.36, and $4,219.63 at the close of May 24, 1946. The new account was closed on June 4, 1946, when the balance of $4,009.67 in the account was withdrawn by Carol and used to open an account in his name in the Chevy Chase branch of the same bank. The amount so withdrawn was included by the respondent in the gross estate of the decedent. The decedent and his wife informed *167 Carol and James at various times prior to 1936 that they could have the store whenever they desired to operate it for their own account. In 1936 a conclusion was reached that business could be increased if a new store building was erected, and plans were made to construct it. Disagreements on building line restrictions delayed commencement of the work for about four years. The decedent and his wife borrowed $20,000 in 1940 from the Riggs National Bank on the security of the property to pay for the construction work. When the new building was completed at the close of 1940 there was more discussion of the matter and Carol and James concluded to postpone action because they were subject to be drafted for military service. Carol did not enter the military service. James was stationed in Washington, D.C., from June 1944 until December 6, 1945, when he was discharged. After James entered the Navy, he and Carol were informed by their parents that they could take over the business when James was discharged from the service. The subject was discussed again in August 1945, after hostilities with Japan ceased. James, like his father, never enjoyed the work in the store. He informed them at that *168 time that upon his discharge from the Navy he wished to engage in the same class of work as a civilian employee of the Navy, and for that reason did not desire to accept an interest in the store from them. Decedent and his wife then decided to give the business to Carol. In September 1945 the decedent took steps to have his liquor license transferred to Carol. On October 25, 1945, Carol received a permit from the District of Columbia to operate a grocery store at 1733 Columbia Road until October 31, 1946. Decedent's liquor license was transferred to Carol on February 1, 1946. On January 1, 1946, the decedent and his wife executed an instrument in which they transferred to Carol as a gift from them all of the good will, stock and fixtures of the business being conducted for them at 1733 Columbia Road, subject to payment by the donee of any debts of the business. Thereafter petitioner did not go to the store to work. No other substantial gifts of property were ever made to Carol by his parents. On January 2, 1946, the decedent and his wife and Carol executed an instrument in which the store room and basement storage at 1733 Columbia Road was leased to Carol for a term of two years *169 at a monthly rental of $300. The rent was paid in cash to the lessors. The donors did not at the time of the gift contemplate that Carol would sell the business. The transfer to Carol was not made in contemplation of death. On May 17, 1946, the decedent executed a gift tax return, prepared by John E. Dwyer, in which he reported that the gift to Carol had a value of $43,670.07, computed as follows: Stock
$ 9,395.07
Fixtures
9,275.00
Good Will
25,000.00
In his determination of the deficiency the respondent included the gift in gross estate at the value of $64,030 as a transfer in contemplation of death. On March 1, 1946, James loaned the amount of $5,000 to his mother and father. The check of James for the amount of the loan and a check drawn against the checking account of Carol and his father in the amount of $4,859.68 was used on March 5, 1946, in payment of the mortgage outstanding against the 1729 Columbia Road property. The business being conducted at 1733 Columbia Road was never listed with a broker for sale and no offer was received by Carol or the decedent prior to February 1, 1946, for the purchase of the business. On March 21, 1946, Max E. Snyder *170 and Louis V. Silverman executed a form of sales contract in which they offered to buy the business at 1733 Columbia Road for $65,000, payable $30,000 cash and the remainder within 18 months. The contract form was not signed by Carol. After a conference on March 22, 1946, in the office of the brokers, Carol and the offerors executed a contract of sale for the business at the price of $64,030, payable $5,500 cash, $24,500 when settlement was made, and the remainder in 18 months, subject to the execution of a lease on the store premises for a term of five years at a rental of $350 a month with an option to renew for a term of eight years at a rental of $375 a month. Petitioner and the decedent attended the conference and signed the contract to evidence their consent to lease the property to the purchasers. A lease on the terms previously agreed to was executed on March 29, 1946. A check for $24,530 of the down payment was issued in favor of Carol, who deposited it on May 7, 1946, in the joint checking account he had with his father. None of the money received by Carol from the sale was ever given to his mother. On May 8, 1946, Carol drew against his and his father's joint checking account *171 a check in favor of his father for $20,000 and on the same day decedent deposited the check in the joint checking account of himself and petitioner and issued a check against that account for $13,617.11 in favor of the Riggs National Bank in payment of the mortgage outstanding against the 1733 Columbia Road property. On the same day the decedent drew a check against his and his wife's joint account for $4,537.02 in favor of the Washington Perpetual Building Association in payment of the mortgage outstanding on the Quesada Street property. The petitioner did not at any time prior to the death of the decedent draw a check in payment of mortgage indebtedness. The decedent became a patient of Dr. R. M. Manganaro on July 3, 1945. His complaint to the doctor was that he felt very weak, tired and exhausted. The doctor's diagnosis was that the decedent probably had secondary anemia and thereafter during the remainder of the month gave him treatments ever other day for that kind of an ailment. In November 1945 the decedent did carpenter work for about three weeks in the home of his daughter Alva in New Jersey, during the course of which he made no complaint of ailments. Dr. Manganaro *172 did not treat the decedent between the end of July 1945 and December 14, 1945, on which date he was called to the home of the decedent. He determined that the decedent had a cold and a cough, which he treated. The doctor saw him again on the 18th and 20th of December on account of acute congestion of the lungs. A chronic cough bothered the decedent and about which he complained to his doctor in January 1946. Dr. Manganaro decided that the decedent was suffering from something more serious than a cold and on March 12, 1946, took an X-ray of the decedent's lungs, which showed pathological marking around the hilus of the lungs but not the exact nature of the condition. X-rays taken thereafter every two weeks were no more positive, but Dr. Manganaro suspected the existence of a cancer and so advised the Giuliani family. A bronchoscopic examination was made on May 8, 1946, which disclosed that the decedent had a bronchiogenic cancer, of which the family was informed. In the meantime, some of the members of the decedent's family became alarmed about the physical condition of the decedent, and on April 21, 1946, conferred with Dr. Manganaro about his condition. The decedent entered Doctors *173 Hospital, Washington, D.C., on May 10, 1946, for an operation which was performed eight days later, and during the course of which the entire right lung was removed. The general health of the decedent at the time of the operation was good. An examination disclosed that the right lung was not cancerous but that the decedent had a malignant bronchial tube cancer which had existed for about six months. An infection developed in the left lung, which was the immediate cause of the decedent's death on May 24, 1946. The decedent consented to the operation, but was never informed by his doctor of the exact nature of his condition. The decedent did not give any indication to Dr. Manganaro or members of his family that he suspected that he had a malignant cancer or that he had any expectation of dying. The decedent did not in his last will and testament, executed in 1935, make any provision for his wife because of a belief that the business being conducted at 1733 Columbia Road and real estate were paid for from their joint efforts and were jointly owned. A like will was executed by petitioner at the same time. On June 4, 1946, petitioner executed, to the order of Carol, her promissory *174 note for $20,000 payable on or before five years after date with interest at the rate of 6 per cent per annum and secured by a deed of trust on the premises located at 1733 Columbia Road. On June 4, 1946, petitioner issued to the order of James and his wife her note in the amount of $15,203.65 payable on or before five years after date with interest at the rate of 4 per cent per annum and secured by deed of trust on the premises located at 1729 Columbia Road. The deed of trust was recorded June 6, 1946. Petitioner has been paying interest on the note but no part of the principal has been paid. Interest in the amount of $150 was paid in September, 1946. The final income tax return of the decedent was executed by petitioner as the surviving spouse. All of the net income of the real property held by the decedent and petitioner was reported in the return. Depreciation was claimed on the property based upon ownership for the first five months of 1946. The income tax return of petitioner for 1946 reported income from the real property for the last seven months of 1946. On June 30, 1947, petitioner executed as surviving spouse, and on July 2, 1947, filed an estate tax return for the *175 decedent's estate in which she reported the property located at 1729 and 1733 Columbia Road, 2706 Ontario Road, and 3610 Quesada Street as jointly held property and deducted as liens the trust notes executed by the petitioner on June 4, 1946, in favor of Carol and James in the amounts of $20,000 and $15,203.65, respectively. In his determination of the deficiency the respondent increased the value of the jointly held real property for estate tax purposes by $33,000 and disallowed as a mortgage lien the note in the amount of $15,203.65 issued in favor of James on June 4, 1946. Opinion The case of United States v. Wells, 283 U.S. 102, recognizes that a transfer may be for a purpose associated with life the gratification of which "may be a more compelling motive than any thought of death." We think that this proceeding is that kind of a case. The grocery and delicatessen business, with liquor included after 1934, had been, with earnings from jointly held real estate, the sole source of livelihood of the decedent and his wife at all times important after their marriage in 1904. Carol's services in the store were continuous from 1919 when his schooling ceased at the *176 age of about 14. Until after the transfer in question he had no other occupation. The other son, James, started to work on a part time basis in the store as soon as he was old enough to perform services. After 1932, when he was graduated from Georgetown University, until he entered the Navy in November 1943, he devoted all of his time to the business of the store. The decedent and his wife were actively engaged in the conduct of the business until about 1934 when the decedent, who never had much attachment for the business, ceased active participation in the affairs of the store and to all intents and purposes practically retired from the business, and petitioner commenced to spend less time in the store. Carol and James then took over the active management of the business and in July 1937 a bank account for deposit of funds of the store was opened in their joint names. The account was continued until James entered the Navy and was then closed in favor of a joint account in the names of decedent and Carol. During the middle thirties, while the two sons were managing the store and the decedent and his wife were not devoting much of their time to its affairs, the sons were informed *177 that they could have the business whenever they desired. The offer was not accepted. In 1936 plans were made to erect a new store building. Unavoidable delays prevented completion of the project until 1940 by which time the sons became subject to the draft for military service on account of which they decided to postpone action in the matter. Carol did not enter the military service, but James became a member of the Navy in November 1943 and was not discharged until December 1945. The subject was discussed again in August 1945 and James, who, like his father, did not enjoy working in the store, refused the offer because of a desire to follow the line of work he was then performing as a member of the Navy, but Carol accepted the offer of his parents and promptly thereafter steps were taken to transfer the business to him. January 1, 1946, was selected as the effective date for the transfer. Thus, it is apparent that the transfer to Carol was the result of a plan that was proposed at least 10 years earlier. It is not suggested that decedent contemplated death at that time within the meaning of the statute and that it continued until the transfer was actually made. But respondent *178 refers to the illness of the decedent commencing in July 1945, with the action taken thereafter concerning the transfer of the liquor license to Carol, payment of mortgage indebtedness on jointly held real property and transfer of the business as disclosing a plan to get his house in order in contemplation of death. The action so taken would have greater weight were it not for the fact that the plan to transfer the business was made many years earlier for a purpose other than in contemplation of death. Moreover, decedent was never aware of his actual physical condition and his attending physician did not become alarmed about his ailment until March 1946, which was six months after the first steps were taken to transfer the business to Carol and about 2 1/2 months after the transfer was actually made. We conclude that the motive for the transfer was to satisfy a purpose associated with life, and, accordingly, not in contemplation of death. Section 811 (e) of the Internal Revenue Code provides as follows, respecting inclusion in the gross estate of a joint interest in property such as was held by decedent and his wife: "SEC. 811. GROSS ESTATE. * * * *179 "(e) Joint Interests. - "To the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, * * * except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: * * *" The statute requires that there be included in the gross estate of a decedent jointly held property "insofar as the property or consideration thereofor is traceable to the decedent." United States v. Jacobs, 306 U.S. 363. The difference between the parties under the issue involving the jointly held real property is what part of the value thereof is includible in the gross estate. Petitioner contends that at least 50 per cent of the value should be excluded because of the consideration furnished by the surviving tenant and respondent argues that all of the consideration was supplied by the decedent. In support of his determination that the property should be included at its full value, respondent contends that as the original investment *180 of $250 of petitioner was lost in 1907 and all of the business operated thereafter belonged to the decedent, including the earnings thereof and bank accounts in which receipts from the store were deposited, decedent's wife made no contribution in money or money's worth. Petitioner argues that her contribution came from her ownership of one-half of the business and profits therefrom, and real estate. The decedent had no income other than what he derived from the business and jointly held real property. The down payments on all of the property were made by checks of the decedent drawn on accounts containing funds of the business and all payments on mortgages outstanding against the properties were derived from the same source and rental from the real estate. No payments were actually made by the petitioner. Such money as the decedent had at the time of his marriage was spent on his wedding. Petitioner's premarriage savings of $250 were lost in 1907 when the business was sold and all of the proceeds of the sale were distributed to Lazzari. At that time they had no capital other than what they had accumulated during marriage from the operation of the partnership business with Lazzari. *181 Thus, the source of money invested in the properties in question was derived from the joint capital investment in the C Street business and earnings from it, the 1733 Columbia Road business and real estate in which some of the earnings were invested. Whether petitioner contributed money or money's worth and the extent thereof depends upon her interest in the C Street and Columbia Road businesses and rental properties. There is substantial evidence to support our finding that decedent and his wife agreed that she should have a one-half interest in the business and property and that the agreement continued until his death. She testified to that effect and it is supported by other testimony. The agreement is indicated by the fact that title to the C Street property was taken in their joint names as was all real estate acquired thereafter and that both signed the instrument by which the Columbia Road business was transferred to Carol. Her services at all times in connection with the operation of the business were at least equal in earning value to that of her husband. Decedent's lack of genuine interest in the business is disclosed by his virtual retirement in about 1934. Respondent *182 cites no cases in support of his view. We think the facts here are in all material respects like those involved in Richardson v. Helvering, 80 Fed. (2d) 548; Berkowitz v. Commissioner, 108 Fed. (2d) 319; and Estate of Lester L. Fletcher, 44 B.T.A. 429. Accordingly, it was error for respondent to include more than one-half of the value of the real estate in the gross estate of the decedent. Petitioner contends under the third issue that the joint checking account in the names of decedent and Carol, the balance in which Carol withdrew after the death of his father, was included in the assets transferred to Carol on January 1, 1946, as a gift and consequently ownership of the balance in the account at the time of the decedent's death was in Carol. Petitioner does not contend that any part of the balance in the account at the time of the gift belonged to Carol. Whether some part of the balance in the account belonged to petitioner is not at issue. The facts before us contain no basis for the petitioner's contention. The account had a balance of $6,371.36 at the close of 1945, the amount of $4,219.63 on the date of decedent's death, and $4,009.67, *183 the amount in controversy, on June 4, 1946, when Carol withdrew the balance to close the account. Carol used the account for his business until its sale in March 1946 and thereafter for other purposes. The checking account is not specifically mentioned in the instrument executed on January 1, 1946, to transfer title to Carol. That the property transferred was not intended to include the bank account is shown by the gift tax return signed by the decedent and prepared by John E. Dwyer, who drafted the instrument of January 1, 1946, in which only stock, fixtures and good will are listed as the property transferred. The account was not available to Carol to pay debts of the business on January 1, 1946, for he agreed to pay all of such liabilities when accepting the gift. From the proof made, we are unable to conclude that ownership of the account ever left the decedent. Accordingly on this issue we sustain the respondent. The amount of $15,203.65 involved in the remaining issue was claimed in the estate tax return as a deduction for a mortgage lien. The lien was established by petitioner on June 4, 1946, when she gave James a deed of trust note to evidence an alleged indebtedness of *184 decedent and hereself to him for that amount. Petitioner alleges that the amount represents the aggregate of loans made by James in 1936, 1937, 1938, 1940, 1941 and 1946, $10,000 in February of the latter year. Most of the evidence offered by the petitioner to establish a right to the deduction is unreliable and much of it is conflicting. To relate all of it in detail would serve no useful purpose. Of the $10,000 alleged to have been borrowed in 1946, one-half thereof was represented by a check of James which decedent actually used to pay mortgage indebtedness. A deduction is allowed for that amount. We sustain the respondent on the remainder of the total amount for failure to prove error. Decisions will be entered under Rule 50.